[Crim. No. 9521. Third Dist. Nov. 5, 1979.]

THE PEOPLE, Plaintiff and Appellant, v.
BRIAN JAMES CARTWRIGHT, Defendant and Appellant.

**COUNSEL**

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, and James Ching, Deputy Attorney General, for Plaintiff and Appellant.

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Michele Vague, Deputy State Public Defender, for Defendant and Appellant.

## Opinion

**KLEAVER, J.**\*—Defendant Brian James Cartwright, respondent and cross-appellant herein, appeals his conviction of second degree murder. The People,[1] appellant and cross-respondent herein, appeal the trial court's reduction of the jury's first degree murder verdict to second degree.

### Statement of Facts

On December 31, 1976, defendant Brian James Cartwright decided to spend New Year's Eve with his brother Robert and his family (Robert's wife Kim and their one and one-half-year-old child Sean). He telephoned their home, at Roseville, and although being told by Kim that they were going to be busy, informed her that he was coming.

He arrived at his brother's home that same evening (Friday) and stayed through Monday, January 3, 1977. Defendant, who had been setting traps and was attempting to get a trapper's license, brought a .410 shotgun and .22 rifle inside the home and placed them to the right of the front door. Defendant gave two reasons for bringing the guns inside. He did not want to leave them in his car so they could be stolen, and he was afraid his brother might shoot him.

Until Monday the principal events at the home involved watching television, listening to the radio, and dining out.

A number of other incidents occurred, however, prior to Monday.

On Saturday when Robert said that a man owed him $45, defendant said he would get it for him. Defendant then walked over to his weapons, picked up the .22 rifle, placed a round in the chamber and said he would take care of it. Robert was able to dissuade defendant from "helping" him, and sometime later when defendant was out of the room, Robert removed the bullet from the chamber. On Sunday when a neighbor knocked on the door, defendant grabbed the gun and went to see who was at the door. This time Robert and Kim talked defendant into putting the rifle down.

---

\*Assigned by the Chairperson of the Judicial Council.

[1]For ease of reference herein, the parties will be referred to as "defendant" and "the People."

Kim and Robert were afraid of defendant and Kim had attempted to discourage defendant from coming to visit them by telling him that they were going to be busy. On a number of prior occasions, defendant had threatened Kim and Robert with a gun, and on one prior occasion had struck Kim in the stomach. While Kim was pregnant, defendant had threatened to cut the baby out of her. On another occasion defendant had told Kim he would throw her against the wall and break all her bones. Robert testified that when defendant was visiting them, he slept with a loaded sawed-off .22 rifle under his pillow in case defendant came after them. On Saturday, Kim left home and went to her sister's house because she didn't want to be in defendant's company.

At 4 p.m., on Monday, January 3, 1977, Kim left for work and took the child with her. Around 4:15 p.m. Rick Stewart and his fiance, Sheila May Hogan, who were friends of Robert and Kim, came by for a visit. Defendant had known Rick all his life. Robert had known Rick about five or six months.

Rick, Robert and defendant wanted to have a party, and Rick wanted to catch up on the party that he had missed on New Year's Eve. Consequently, at 4:30 p.m., when it was learned that there was no beer in the house, Rick, Sheila, and Robert left to buy beer. They returned with six 6-packs of beer and started drinking around 4:45. At around 7:30 p.m. it was decided that they should smoke some marijuana and Robert went with Rick to buy marijuana from a person known to Robert. Rick and Robert returned about 30 to 45 minutes later. While Rick and Robert were gone, defendant went into the bedroom and picked up Robert's rifle and explained to Sheila how it worked. Defendant also explained how his own .22 rifle worked, and while showing it to Sheila, loaded a round into the chamber. Defendant told Sheila that he had strangled Robert but brought him back to life. Defendant then said he would kill his brother if he had the chance.

When Rick and Robert returned, marijuana cigarettes were made; Rick, Robert, and defendant smoked from three to six of them.

While the parties were drinking and smoking, defendant and Rick talked. Robert characterized their conversation as "B.S."

Defendant and Rick participated in a number of contests, including a beer chugging contest and an arm wrestling contest. Defendant was

noted to have been upset when Rick made fun of him because he could not find a cigarette lighter which was on a table next to him. Rick was upset and gave defendant a "dirty look" when defendant "doubled up his fists" and became upset about Rick and Sheila living together because they were not married.

Robert and Sheila thought defendant had drunk three or four 12-ounce beers. Defendant stated to police that he had drunk about a six pack-and-a-half. Between 8:15 and 8:30 p.m., Robert became sick and vomited. About 15 minutes later, Kim arrived home from work, found her husband on the floor, and asked defendant and Rick to move him to the bathroom.

Sheila, who had begun to grow afraid of defendant, asked Rick if he felt like leaving. Rick told her he did, and then asked defendant to come to his house in Live Oak. When defendant declined, Rick asked him again, then offered defendant $2 for gasoline. After noting that defendant turned red and started to perspire, Sheila went outside to Rick's car.

Within a few minutes thereafter, defendant walked over to the door, picked up his .22 rifle, put the file to his shoulder, and fired one shot into Rick's head. Defendant then stated, "Hey, people, I have to get out of here" and ran out of the house to his car. He drove away and in doing so, struck a parked car.

When Robert heard the shot, he rolled off the bed, grasped his rifle and went into a prone position with it and aimed at the door. Robert testified that he thought defendant had fired a shot, and was waiting for him to come through the door. When defendant did not, Robert went out into the living room and found Rick lying on the floor, mortally wounded with a bullet wound above the left temple. Kim then called the police and an ambulance.

Defendant was apprehended a short time later by officers who had heard a radio alert. According to the officers, defendant was driving within the speed limit, was not swerving, and stopped the car promptly on the road shoulder after they had turned on their vehicle's emergency lights. Without any command from the police, defendant got out of his car and placed his hands on the windshield. Defendant was handcuffed and was informed that he was under arrest on suspicion of attempted

murder. When he arrived at the police station at 9:45 p.m. he was booked and told he was under arrest for murder. At 9:58 p.m. blood was taken for a drug and alcohol test, which was later stipulated to be .06 percent alcohol and the drug test negative; however, these tests do not detect marijuana use.

## APPEAL BY THE PEOPLE

Following the jury verdict of first degree murder the trial court granted defendant's motion under Penal Code section 1181, subdivision (6) for modification of the jury verdict and ordered reduction to second degree murder. The People appeal from this order, alleging an abuse of discretion by the trial court in the lack of supporting evidence to justify the modification. The defendant, as cross-appellant, contends that the purported appeal by the People is a violation of defendant's right not to be placed twice in jeopardy and that the statutory scheme provided in Penal Code section 1238 violates his right to equal protection. Defendant contends, alternatively, that if the People have the right of appeal from the order of modification, the order should be affirmed on appeal.

Penal Code section 1181, subdivision 6[2] allows the trial court to reduce a conviction to a lesser degree or to a lesser crime included within the crime of which the defendant is convicted. The right of the People to appeal from an order modifying a jury verdict is set forth at Penal Code section 1238.[3]

Whether an appeal by the People under Penal Code section 1238 constitutes a violation of the right against being placed twice in jeopardy was raised but not decided in *People* v. *Drake* (1977) 19 Cal.3d 749

---

[2]Penal Code section 1181, subdivision (6) provides in part as follows: "When the verdict...is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict...without granting or ordering a new trial,...."

[3]Penal Code section 1238 provides in part as follows: "(a) An appeal may be taken by the people from any of the following:

" . . . . . . . . . . . . . .

"(6) An order modifying the verdict...by reducing the degree of the offense or the punishment imposed or modifying the offense to a lesser offense."

The provisions for appeal from an order modifying the offense to a lesser offense was added by Statutes 1978, chapter 1359, section 2, effective 1979. At the time the appeal was filed in this case, the right of appeal was provided only from an order reducing the degree of the offense.

[139 Cal.Rptr. 720, 566 P.2d 622]. The Supreme Court held that the provisions of Penal Code section 1238 then in effect (and in effect at the time the appeal was taken in this case) did not purport to allow an appeal by the People from an order reducing the conviction to a lesser included crime. Since the trial court's order in the *Drake* case resulted in a reduction of the conviction to a lesser included crime, the People's appeal was dismissed as being without statutory authority. (*Id.* at pp. 754-755.) This case presents a different issue, however, inasmuch as the trial court's order reduced the degree of the offense.

■ We hold that the People's right of appeal provided by Penal Code section 1238 is not violative of the right against being placed twice in jeopardy. The right not to be placed twice in jeopardy arises following a conviction or acquittal of a criminal charge and precludes a second prosecution for the offense charged. (Pen. Code, § 687; Cal. Const., art. I, § 15; U. S. Const., 5th Amend.) Double jeopardy is directed at the threat of multiple prosecutions. Where there is no threat of multiple punishment or successive prosecutions the double jeopardy clause is not offended. (*United States* v. *Wilson* (1975) 420 U.S. 332 [43 L.Ed.2d 232, 95 S.Ct. 1013]; *In re Richard C.* (1979) 89 Cal.App.3d 477 [152 Cal.Rptr. 787]; Witkin, Cal. Crimes (1978 supp. to vol. 1) Defenses, § 185, pp. 164-165.) In the instant case, appellate review does not threaten the defendant with a second trial. As a consequence, the People may appeal the postverdict rule favoring the defendant without running afoul of the double jeopardy clause. (*Ibid.*)

■ Nor is the statutory scheme provided by Penal Code section 1238 a violation of defendant's right to equal protection of the laws. (Cal. Const., art. I, § 7; U. S. Const., 14th Amend.) Defendant contends that since the right of appeal by the People is allowed under Penal Code section 1238, subdivision (a)(6), only from an order modifying a conviction to a lesser degree, but not from a modification to a lesser offense,[4] the statutory scheme establishes two separate classes of defendants as to whom adverse jury verdicts may be modified under Penal Code section 1181, subdivision 6. The first class, in which defendant finds himself, is that class of persons who stand convicted of a criminal offense which has been reduced to a crime of a lesser degree, and from which order the People may appeal. The second class is composed of persons convicted of a crime which has been reduced by the trial court

---

[4] As noted, the Legislature has amended Penal Code section 1238, effective 1979, to provide for appeal in both instances. The equal protection argument therefore has a rather narrow application in view of the 1978 amendment to section 1238.

to a lesser included offense but from which the People may not appeal. (See *People* v. *Drake, supra,* 19 Cal.3d 749.)

"The Legislature has determined that except under certain limited circumstances the People shall ha᾿ no right of appeal in criminal cases." (*People* v. *Superior Court (Howard)* (1968) 69 Cal.2d 491, 497 [72 Cal.Rptr. 330, 446 P.2d 138].) Those circumstances are set forth in Penal Code section 1238. The statutory scheme does not permit an appeal from an acquittal. It permits appeals by the People only in cases of defendants convicted of crime whose convictions are, as urged on appeal by the People, improperly reduced to an offense of a lesser degree by the trial court. A defendant has no legitimate claim to benefit from a trial court's improper reduction of his verdict when the trial court's error can be corrected without subjecting him to a second trial before a second trier of fact. The effect of an appellate court ruling favorable to the People, reversing the trial court modification, is to restore defendant to the same position as if the improper reduction of jury verdict had not occurred. In *People* v. *Drake, supra,* an exhaustive examination of legislative intent surrounding Penal Code section 1181 and Penal Code section 1238 led to the conclusion that the Legislature intended to distinguish between the right of appeal to the People in reductions to a lesser degree and reductions to a lesser offense. The latter involve a potential violation of the double jeopardy concept, which was clarified in *Gomez* v. *Superior Court* (1958) 50 Cal.2d 640 [328 P.2d 976], resulting in a holding that a jury verdict of either a lesser degree than that charged or a lesser offense than that charged results in an acquittal of the greater offense. (See *People* v. *Drake, supra,* at pp. 755-756 of 19 Cal.3d.)

Defendant urges the application of the standards set forth in *People* v. *Olivas* (1976) 17 Cal.3d 236 [131 Cal.Rptr. 55, 551 P.2d 375], as involving in this case a "personal liberty interest." We decline. In *Olivas* the "suspect classification" resulted in possibly longer periods of confinement for persons committed to Youth Authority for commission of a criminal offense than persons committed to other penal institutions for the same criminal offense. The allowance of an appeal right to the People under Penal Code section 1238 does not subject any class of persons to possibly more stringent punishment, nor does it deprive any class of persons of any right. In fact, the correction on appeal of erroneous trial court orders reducing the degree of offense places the defendant in exactly the position he should be in, i.e., convicted of an offense by jury verdict as required by law. It is true that a distinction

exists as suggested by defendant between persons who benefit by improper trial court reduction to a lesser offense and those who may not benefit by an improper trial court ruling in reducing their offense to one of a lesser degree. However, the latter can scarcely be said to have been harmed by the unequal *benefit* afforded to the former. In our view the equal protection argument has no application to the issues in the present case.

■ We turn to the merits of the People's appeal. The People contend that the trial court erred in ordering a modification of the jury verdict from first degree murder to second degree murder. We disagree.

■ "While it is the exclusive province of the jury to find the facts, it is the duty of the trial court to see that this function is intelligently and justly performed, and in the exercise of its supervisory power over the verdict, the court, on motion for a new trial, should consider the probative force of the evidence and satisfy itself that the evidence as a whole is sufficient to sustain the verdict. [Citations omitted.] It has been stated that a defendant is entitled to two decisions on the evidence, one by the jury and the other by the court on motion for a new trial. [Citations omitted.] This does not mean, however, that the court should disregard the verdict or that it should decide what result it would have reached if the case had been tried without a jury, but instead that it should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict. [Citations omitted.] In passing upon a motion for a new trial the judge has very broad discretion and is not bound by conflicts in the evidence, and reviewing courts are reluctant to interfere with the decision granting or denying such a motion unless there is a clear showing of an abuse of discretion." (*People* v. *Robarge* (1953) 41 Cal.2d 628, 633 [262 P.2d 14]; *People* v. *Serrato* (1973) 9 Cal.3d 753 [109 Cal.Rptr. 65, 512 P.2d 289].)

■ Without attempting to detail the lengthy psychiatric testimony in this case, the record is replete with opinions of psychiatrists that defendant was diagnosed as having a paranoid tendency (or paranoid personality disorder) and noted that persons having such characteristics project and distort reality. Two psychiatrists concluded that defendant, whom they described as having gone through an acute psychotic episode during the evening, could not premeditate and deliberate inasmuch as the paranoid delusion took over his free will to premeditate. It was concluded that defendant felt that he acted out of self-defense to save

himself from imminent threat of being killed by the eventual victim. While one of the psychiatrists disagreed with the other two psychiatrists on defendant's ability to premeditate and deliberate, the distinction created only a dispute in the evidence insufficient to compel us to the conclusion that the trial court abused its discretion in modifying the jury verdict. We therefore conclude that the evidence supports the trial court's order modifying the conviction from first degree murder to second degree murder.

### APPEAL BY DEFENDANT

Defendant raises the following issues on appeal:

1. Defendant neither voluntarily waived his *Miranda* rights nor voluntarily agreed to speak to the police. The receipt in evidence of his videotaped statement was therefore error and requires reversal.

2. The trial court erred in denying defendant's motion to reinstate his plea of not guilty by reason of insanity. If the motion to reinstate the plea was not timely as made following jury discharge, then defendant was deprived of the effective assistance of counsel in failing to move for reinstatement.

3. The trial court erred in submitting jury instructions which permitted consideration of consciousness of guilt on the issue of malice.

4. Defendant is entitled to good time credits.

I

The People first contend that the issue of voluntariness cannot be considered on appeal. We disagree.

The motion upon which the voluntariness hearing was held was referred to as a motion pursuant to Penal Code section 1538.5, subdivision (a)(1). The moving papers and supporting documents clearly define the issue as being whether defendant voluntarily waived his *Miranda* rights and whether he voluntarily agreed to make the statement which was videotaped. There is nothing in the moving papers which suggests that the statement was in any way a product of an illegal search. (*People* v. *Superior Court (Solnay)* (1975) 15 Cal.3d 729 [125 Cal.Rptr. 798, 542 P.2d 1390].)

We therefore consider the motion to have been a nonstatutory motion to suppress the statement as having been taken in violation of defendant's rights outlined in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. Indeed, the motion was renewed at trial prior to the receipt into evidence of the videotaped statement.

*People* v. *Superior Court (Zolnay), supra,* 15 Cal.3d 729, clearly distinguishes between the Penal Code section 1538.5 motion to suppress evidence of an illegal search under the Fourth Amendment and the nonstatutory motion to suppress an involuntary statement under the Fifth Amendment. ■ Procedurally, a ruling on the former is a final order, subject to pretrial review, while the latter is a ruling on an evidentiary matter, is not final, and is not reviewable pretrial. A ruling on either motion, however, is reviewable on appeal following a conviction upon a plea of not guilty. (*Id.* at pp. 733-734.)

■ Therefore, while the caption erroneously referred to Penal Code section 1538.5 as the basis for the motion we proceed to consider the motion in its true form, i.e., a nonstatutory motion to suppress a statement allegedly taken in violation of defendant's Fifth Amendment rights. ■ In so doing "it is our duty to examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was properly found.... With respect to conflicting testimony... 'we accept that version of events which is most favorable to the People, to the extent that it is supported by the record.'..." (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 609 [147 Cal.Rptr. 172, 580 P.2d 672].)

■ We first note that defendant signed a standard form *Miranda* waiver, responding affirmatively that he understood the rights explained to him and stating that he agreed to talk to the interrogating officer. Initially, when asked whether he wished to talk to the police, defendant stated, "I'm willing to answer any questions." Defendant's vocabulary and response to the questions does not suggest someone who could not make rational choices. During the videotaped statement defendant was asked if he was tired and whether he wished to stop. He declined the opportunity. We have, in addition to reviewing the record, independently viewed the videotaped statement.

At the voluntariness hearing, the trial court had before it the testimony of the arresting officers and the report of defendant's blood alco-

hol concentration, showing .06 percent alcohol by weight and a negative drug test (which, however, would not have revealed marijuana usage). The trial court viewed the videotaped statement. At the trial, when the motion was renewed the trial court had heard the testimony of witnesses present at the time of the shooting, and had before it the psychiatric reports, including defendant's version of the amount of alcohol and marijuana consumed. The testimony of defendant's companions was that he had been drinking, but not excessively, and had not been seen to stagger or slur words when speaking; the testimony of the arresting officers and those who saw defendant at the police station was that defendant did not appear intoxicated at 9 p.m., some two hours prior to the confession. Moreover, defendant's blood alcohol concentration does not suggest that his abilities were so impaired that he did not have free will or rational choice.

The trial court did not articulate the standard upon which its finding of voluntariness was made. ■ That standard has been determined to require proof beyond a reasonable doubt. (*People* v. *Jimenez, supra,* 21 Cal.3d at p. 608.) That standard is to be retroactively applied to defendants with cases pending on appeal. In cases with a silent record as to the standard of proof applied by the trial court, the appellate court should review the entire record of the voluntariness hearing and determine whether there is a "reasonable probability that a result more favorable to the [defendant] would have been reached" if the proper standard had been used. (*Id.* at p. 609; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

■ Our independent review of the entire record on the issue of voluntariness convinces us that irrespective of the standard applied by the trial court the result would have been the same.

## II

At his arraignment February 9, 1979, defendant entered dual pleas of not guilty and not guilty by reason of insanity. He was examined by four psychiatrists as to his sanity at the time the offense was committed and as to his competence under Penal Code section 1368. Based upon the reports of those examinations there was, according to defense counsel, no evidence of M'Naghten insanity and defendant was competent under Penal Code section 1368. Immediately prior to trial on April 6, 1977, the plea of not guilty by reason of insanity was withdrawn by defendant with approval of counsel. On May 10, 1977, defendant was

found guilty by jury verdict of first degree murder. After the jury was discharged defense counsel stated his intention to move to reinstate the plea of not guilty by reason of insanity and the hearing was calendared for May 13, 1977. The motion for reinstatement was made, together with a motion for a new trial.

It is clear from the record that the trial court considered the motion to reinstate the plea of not guilty by reason of insanity to be one which was properly before the court for consideration. There was no issue raised by the prosecution or by the court as to the timeliness of the motion.

Defendant's contention that the motion for reinstatement of the plea was not timely as being made after discharge of the jury is without citation of authority. In view of the position of the trial court, however, that the motion was properly before it following discharge of the jury, and in view of the court's procedure in directing the preparation of a transcript of psychiatric testimony to allow a determination on the merits, we decline to address the issue of timeliness of the motion and proceed to the merits of the motion's denial. Since the timeliness of the motion is not an issue on this appeal, the question of competency of counsel as it relates to that issue is also not addressed.

The motion to reinstate the plea of not guilty by reason of insanity was denied by the trial court. The court had heard the evidence produced at trial, had received a transcript of testimony of the three psychiatrists who testified at trial and had memoranda from counsel on the issues raised.

An affidavit was filed by Dr. Lunde, one of the psychiatrists who testified, that while his initial opinion was that no reason was apparent to believe defendant insane at the time the offense was committed, that opinion was altered upon viewing the videotape of defendant's statement, following which he believed defendant to have been insane at the time the offense was committed.

 We first note that defendant voluntarily withdrew his plea of not guilty by reason of insanity prior to commencement of trial. The trial court inquired as to the reason for the withdrawal, explained to defendant that if the plea were to be withdrawn there would be no separate trial on the issue of sanity, and found that the withdrawal of the

plea was voluntary. It was stated by defense counsel that none of the four examining psychiatrists supported a claim of insanity. Two other psychiatrists, Dr. Lyons (called by the defense) and Dr. Stroud (called by the prosecution) testified at trial. Dr. Lyons was not questioned as to defendant's sanity at the time of the shooting. Dr. Stroud testified that defendant was legally sane at the time of the shooting. In the written report furnished by Dr. Lyons prior to trial the doctor raised the issue of M'Naghten insanity and stated that he desired to view the video-taped statement before reaching a conclusion. There was no further reference to the videotaped statement and no opinion from him with respect to defendant's sanity, either at trial or in the posttrial proceedings.

We note that his case appears to be the first to consider whether a trial court abused its discretion in refusing to permit the *reinstatement,* as contrasted with a first entry, of a not guilty by reason of insanity plea.

▪ The applicable standard in reviewing a trial court's refusal to permit a change of plea "'rests in the sound discretion of the trial court and a denial may not be disturbed [on appeal] unless the trial court has abused its discretion. [Citations.]' (*People* v. *Francis* [(1954)] 42 Cal.2d 335, 338 [267 P.2d 8]; see also *People* v. *Brotherton* [(1966)] 239 Cal.App.2d 195, 200 [48 Cal.Rptr. 513].)...While applications to change a plea should be considered 'liberally,' (Pen. Code, § 1018) it is equally settled that '[i]n order to justify the granting of a change of plea the trial court should have before it *clear and convincing evidence.* [Citations.]' (Italics added.) (*People* v. *McDonough* [(1961)] 198 Cal.App.2d 84, 90 [17 Cal.Rptr. 643].)" (*People* v. *Tanner* (1970) 13 Cal.App.3d 596, 599 [91 Cal.Rptr. 656, 42 A.L.R.3d 1408].)

▪ In the present case the evidence before the trial court was not clear and convincing. The M'Naghten test of legal insanity "...means a diseased or deranged condition of the mind which makes a person incapable of knowing or understanding the nature and quality of his act, or makes a person incapable of knowing or understanding that his act was wrong." (*People* v. *Drew* (1978) 22 Cal.3d 333, 339 [149 Cal.Rptr. 275, 583 P.2d 1318].)[5] Dr. Lunde testified that defendant was insane at

---

[5]The *Drew* decision "will apply retroactively to only those cases not yet final in which the defendant has pled not guilty by reason of insanity and to cases that have not yet come to trial as of the date of the finality of this opinion." (*Drew, supra,* 22 Cal.3d at p. 348.)

the time of the offense. He went on to explain that defendant knew the nature and consequences of his act but because of his delusional perception he could not differentiate between right and wrong as it is ordinarily perceived. He stated that his original opinion that defendant was sane at the time of the shooting was based upon his view that defendant had acted on apparent misperception of events relating to the victim and to defendant's belief that the shooting was in defense of himself. As noted, this opinion was changed upon viewing the videotaped statement. On cross-examination Dr. Lunde conceded that certain aspects of the evidence supported a conclusion that defendant knew that his act of shooting the victim was wrong.

The second prong of the M'Naghten test is that a person is incapable of knowing or understanding that his act was wrong. (*People* v. *Drew, supra,* 22 Cal.3d at p. 339.) Dr. Lunde testified "I think he knew all along that it was wrong to kill." Previously, on direct examination, Dr. Lunde had stated, "He could have premeditated. He had that ability intact, yet in his premeditation, his delusional perception would enter into it. [His delusion] to a large extent [took over his free will to meditate]. . . . . [H]is perception of the threat at that time entered into his motivations." When asked whether he would change his opinion of defendant's state of mind based on the circumstances of defendant's flight, defendant's statement that he took careful aim wanting to shoot Stewart in the brain, that defendant thought in terms of a showdown, and that defendant had felt sick after he shot Stewart, Dr. Lunde stated, "I still believe that his right and wrong at that time had to do with his feeling of being threatened." This is persuasive evidence of diminished capacity to premeditate and deliberate; however, *as evidence of insanity,* this testimony is nothing more than testimony to the effect that defendant misperceived his environment *and in the context* of that misconception, he felt he had to resort to self-defense. In fact, Dr. Lunde stated that from defendant's point of view, he acted in self-defense.

Thus, we conclude that Dr. Lunde's testimony was not to the effect that defendant was insane within the meaning of the M'Naghten test, rather it was that defendant acted as the result of an irresistible impulse causing him to believe that he must shoot Rick to save himself. The trial court did not abuse its discretion in refusing to permit the reinstatement of the not guilty by reason of insanity plea.

## III

█ Defendant contends that evidence of his flight and of remarks he made immediately after the shooting were erroneously admitted into evidence.[6]

We disagree. The statement was so immediate to the shooting as to be part of the incident. It is relevant to explain or tend to prove the nature, motive, purpose or intent of the act under the res gestae doctrine. (*Menefee* v. *Williams* (1968) 259 Cal.App.2d 56, 62 [66 Cal.Rptr. 108].) Here, defendant raised the issue of diminished capacity. His ability to comprehend the seriousness of the immediately preceding event is clearly relevant. His ability to operate the vehicle during the ensuing few minutes and his reaction upon being stopped are also relevant to this issue. There was no error in admitting this evidence.

## IV

█ Defendant contends that he is entitled to good time credits based upon the 318 days he was in custody prior to sentencing. The crime occurred prior to July 1, 1977, and therefore is controlled by the Indeterminate Sentence Law. (See *People* v. *Alcala* (1977) 74 Cal. App.3d 425 [141 Cal.Rptr. 442]; *People* v. *Superior Court (Gonzales)* (1978) 78 Cal.App.3d 134, 140 [144 Cal.Rptr. 89].) Under the circumstances the Community Release Board, not the trial court, is delegated the authority to determine the term of imprisonment, including any reductions for good behavior. (Pen. Code, §§ 1170.2, 2931.)

The judgment is affirmed.

Paras, Acting P. J., and Reynoso, J., concurred.

---

[6]Immediately after firing the shot that killed Stewart, defendant stated "Hey, people, I have to get out of here" and ran from the house to his car. As defendant drove away, his car struck a parked car. He was apprehended a short time later by officers who heard a radio alert. The officers testified that defendant was driving within the speed limit, was not swerving, and that he stopped the car promptly on the road shoulder when the red lights of the patrol car were activated. Without command from the police, defendant got out of his car and placed his hands on the windshield. The court gave CALJIC No. 2.52 regarding flight.