[Crim. No. 21243. Sept. 26, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD G. MONTIEL, Defendant and Appellant.

914

**COUNSEL**

Quin Denvir and Frank O. Bell, Jr., State Public Defenders, under appointment by the Supreme Court, Ezra Hendron, Chief Assistant State

Public Defender, and Carol Jean Ryan, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Willard F. Jones and William George Prahl, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**LUCAS, J.**—This automatic appeal follows a judgment imposing a penalty of death pursuant to the 1978 death penalty law. (Pen. Code, §§ 190.1 et seq., 1239 et seq.; all statutory references are to this code unless otherwise indicated.)

An information was filed in superior court charging defendant Richard G. Montiel with the following offenses committed on January 13, 1979: count I, the robbery of Eva Mankin (§ 211); count II, the burglary of Ms. Mankin's residence (§ 459); count III, the murder of Gregorio Ante (§ 187); and count IV, the robbery of Mr. Ante. As to count III, it was charged that defendant personally used a knife during commission of the crime (§ 12022, subd. (b)) and three special circumstances were also alleged: the murder was intentional and for financial gain (§ 190.2, subd. (a)(1)); the murder was especially heinous, atrocious and cruel (*id.*, subd. (a)(14)); and the murder occurred during commission of a robbery (*id.*, subd. (a)(17)(i)). As to count IV, defendant was also charged with inflicting great bodily injury (§ 12022.7), with personal use of a deadly weapon (§ 12022, subd. (a)), and with committing an offense against an aged person (§ 1203.09, subds. (a), (b)(i), (b)(iii)). In addition, a prior felony conviction was alleged.

Defendant entered pleas of not guilty to each count and denied all other allegations. When the jury trial commenced, defendant admitted the prior conviction outside of the jury's hearing. After trial had started, defendant moved to enter an additional plea of not guilty by reason of insanity, but his motion was denied. The jury found defendant guilty of all counts, and found all allegations to be true except for the special circumstance alleged pursuant to section 190.2, subdivision (a)(14) (the murder was especially heinous etc.).

The ensuing penalty phase trial resulted in a hung jury and the court declared a mistrial. A new penalty trial culminated in a verdict setting the penalty at death. Defendant's subsequent motions for new trial and to mod-

ify the verdict were denied and the court imposed the death penalty as to count III, the murder conviction. This appeal automatically followed.

FACTS

1. *The Prosecution's Case*

On January 13, 1979, defendant was living with his mother. His sister was visiting, accompanied by her two children, ages three and five. Eva Mankin, who resided across the street from the Montiel household, drove up to her home that morning with three grocery bags in her car. She began bringing the groceries into her home, placing one bag on the front porch and setting her keys and purse next to it. She noted a young man whom she identified as defendant accompanied by two small children approaching through her front yard.

As he came closer, defendant offered to help Ms. Mankin put her groceries in the house. She thanked him and refused. He nonetheless repeated himself two more times and the final time spoke in a tone of voice which indicated to Ms. Mankin that defendant "meant it." At his direction, each child then took a bag and brought it into the Mankin house. The children left, but defendant remained. Ms. Mankin observed that his eyes were "staring" and "glassy." When defendant did not respond to her requests to leave, Ms. Mankin took him by the shirt and led him out of her house. She returned inside, locking the door.

Defendant then broke the glass in the door and reached in to unlock it. As Ms. Mankin telephoned the police, defendant neared her, asking for her purse. When she told him she had called the police, defendant grabbed her purse and ran, heading across the street. The purse was later found in Ms. Mankin's automobile. Missing were two checkbooks, three bankbooks, a small knife belonging to Mr. Mankin, and $8 in cash. The police officer who responded to Ms. Mankin's call spoke with defendant's sister, who told him she had seen her brother run from the Mankins' carrying a purse. (At trial, she denied this statement.)

Soon after the Mankin incident, around 11 a.m., defendant arrived at the home of Victor and Maruy Cardova. Also living at the Cardovas' were Maruy's sister, Lisa Davis, and her boyfriend, Tom Stinnett. Stinnett, who had been in the front yard, followed defendant into the house where he helped to dress a cut on defendant's arm. In the process, he removed a piece of defendant's skin with a razor blade, applied alcohol and then bandaged defendant's arm. Defendant appeared jittery and shaky, and seemed to Stinnett to be under the influence of drugs. Defendant told Stinnett and the

others that he "did a purse snatch" and gave a checkbook to Maruy, asking her to cash some checks so he could buy clothing. She refused, and Victor supplied a change of clothes.

According to Maruy, when he arrived, defendant entered without knocking which was unusual. He was rowdier than normal and was "acting mean" and "giving orders," also atypical behavior for him. Lisa Davis testified that defendant "acted a little weird." At one point he started wiping a mole under her eye without explanation, and later suddenly grabbed her arm and purse and started telling her to get him a beer.

After a half hour, Victor decided to take defendant by motorcycle to his brother's home. Victor's cycle broke down on King Street, and Victor pushed it towards a gas station while defendant dismounted and started walking up the driveway of a nearby house. Victor called his wife from the gas station, asking her to come pick them up. He then began working on the motorcycle. Approximately 10 minutes later defendant walked up to him and told him "he killed—he just killed a man," and did it "like you do a goat." Victor did not believe defendant and continued his work. Victor refused to comply when defendant told him he had left two beer cans in the murdered man's house and asked Victor to retrieve them. Defendant then left, returning soon thereafter carrying a can of beer and a paper sack.

About 15 minutes later, Maruy arrived with Stinnett and they loaded the motorcycle in the back of the pickup. On the way back to the Cardovas', defendant told Stinnett "that he cut some man's head off" and that "he was the devil and a ride with him would be on top . . . ." When they arrived, Victor and defendant went into a bedroom where defendant produced several $20 bills, some pennies, and a small three-inch pocket knife. The Cardovas refused his offer of money.

Victor told defendant to leave and telephoned for a taxicab. Defendant continued "flipping out" and saying he was the devil. When no taxicab arrived, Victor drove defendant to a motel. The Cardovas then left without defendant. When Maruy returned home later that day, she discovered Mankin's checkbooks, a large number of pennies, and a 12-inch butcher knife with a broken handle, covered with coagulated blood, in her bedroom. Stinnett and Maruy washed off the knife and threw it into a nearby canal. Lisa Davis saw the remaining items the next day. She kept some of the pennies and later turned them over to the police. Meanwhile, on the night of the 13th, defendant returned to the Cardovas' and inquired about the knife. Victor told him not to worry about it but that the police were looking for him.

The next day, the police contacted Victor. When he saw defendant later that day and asked if he knew what he had done, defendant nodded his head. Defendant then told Victor he was worried that he might have left fingerprints on the telephone. Soon thereafter Victor left California in order to avoid testifying. After he was arrested in Arizona as an accessory, he was returned to California where he was granted immunity in exchange for his testimony.

The victim, Gregorio Ante, was 78 years old and slightly disabled by a stroke. He lived with his wife on King Street, but was alone on the morning of January 13. About 11 a.m., Gregorio's son Henry arrived to help with some repairs. Henry's son and daughter-in-law, the Halls, arrived soon after to buy a piano from Gregorio whom they paid $200. He placed the money in his left shirt pocket. Once the piano had been loaded onto their truck, the Halls left.

Gregorio then gave Henry $20 to buy parts for a faucet he was fixing. Henry also noticed his father removing some money from his pants pocket. Henry left around 12:10 p.m., leaving the front door unlocked. As he departed, he noticed two men on a motorcycle in front of the house who watched as he drove off.

About five minutes later, David Ante, another grandson of Gregorio, telephoned his grandfather. When there was no answer, he drove to the house, arriving in five to ten minutes. Entering by the unlocked front door, he found Gregorio's body. He at first thought he had suffered a heart attack. The autopsy revealed two superficial wounds on Gregorio's right cheek, two on the side of his neck, one on the lower neck, and one large deep wound mid-neck, probably caused by two separate thrusts. Death occurred because of obstruction of the airways.

When the body was found, the left pocket of Gregorio's pants was pulled out, and $180 was found in his left front inner shirt pocket. In his bedroom, the mattress had been moved off the bed, and jars containing the pennies which Gregorio collected were missing.

Defendant was arrested on January 16 and taken to Kern County jail where he shared a cell with Michael Palacio. Palacio testified that defendant told him that when Victor's motorcycle broke down, defendant entered a house to use the telephone. When he hung up the telephone, an old man appeared and asked what he was doing. The man sat in a chair, and defendant saw money in his shirt pocket. He then went to the kitchen, got a knife, and cut the man's throat and took the money to spend on clothing.

In exchange for Palacio's testimony, a felony charge against him for marijuana possession while in prison was dismissed.

During the trial, two experts testified regarding defendant's mental state. The first, Dr. Ronald Siegel, a psychopharmacologist and psychologist, was called by the prosecution. On the basis of the trial testimony, background information on defendant, and interviews with some of the witnesses, Dr. Siegel concluded that defendant was under the influence of PCP on January 13. However, while defendant was intoxicated, Dr. Siegel concluded that the degree was insufficient to diminish his capacity to form the intent to kill or to steal because defendant did not display certain indicia of PCP effect. He relied upon lack of nystagmus, or oscillation of the eyeballs, lack of difficulty in walking or other motor coordination, lack of convulsions or amnesia, ability to follow directions, and the awareness demonstrated in the statements made to Palacio. He concluded defendant was also able to premeditate and meaningfully reflect upon the consequences of his acts.

### 2. Defense Case

Defendant took the stand in his behalf. While living at his mother's home, he had used three to four PCP cigarettes a day. On the morning of January 13, he bought a six-pack of beer soon after rising at 9 a.m., and smoked a joint of PCP. He remembered something telling him to help when he saw a woman drive up across the street. He generally felt a floating sensation and felt no pain when he put his hand through a window. The woman yelled at him, and he got her purse as she swung it at him. He walked off and dropped the purse and when various items fell out, he picked them up and placed the purse in the car. As he jogged away, he noticed checkbooks in his hand, and decided to return them later.

At the Cardovas', he saw three people, two in white uniforms, in the front yard. After saying to them "So you're waiting for me," defendant entered the house. When his friends cut off the piece of hanging skin from his wound and applied alcohol, he felt no pain. He tried to wipe something off beneath Lisa Davis' eye, not realizing it was a mole.

Before leaving with Victor, defendant bought two cans of beer and then he and Victor smoked another joint of PCP. After the motorcycle broke down, defendant walked to a house to use the telephone. His feet felt heavy. When he reached the door, he knocked but got no answer. He looked in through a window in the front door, and saw a man lying in blood. He then returned to Victor and told him he had *seen* someone with his throat cut, not that he had cut someone's throat. He told the same version to Stinnett, and did not recall telling anyone that he was the devil.

When Victor asked him if he recalled what he had done, defendant nodded "yes" on the assumption that he was inquiring about cutting his arm. He also told Victor that he did not kill anyone. As to Palacio, while soliciting his advice, defendant merely repeated what was in the police report shown to him by his public defender.

### 3. *Rebuttal*

On rebuttal, witnesses testified that there was no window in Ante's front door, and that blood on Gregorio's body could not be seen by an observer looking through the window. The public defender also stated he normally would not have supplied defendant with a police report at the time indicated, and a police officer described how Palacio's version contained information not in the report. Dr. Siegel also explained that he had not seen defendant personally because defendant was unwilling to talk to him.

### 4. *Penalty Phase*

We do not describe the evidence presented at the penalty trials because as we will demonstrate retrial of that phase is mandated by previous decisions of this court.

GUILT PHASE

### 1. *Jury Composition*

■ Defendant asserts that the removal of persons opposed to the death penalty during the guilt phase of his trial violated his right to a jury composed of a representative cross-section of the community. He presents no arguments which were not considered and rejected in *People* v. *Fields* (1983) 35 Cal.3d 329, 342-353 [197 Cal.Rptr. 803, 673 P.2d 680]. There we held that those who were determined to vote automatically against the death penalty did not constitute a cognizable class under the decisions defining that phrase and that their exclusion from a jury did not render the jury unrepresentative or unconstitutional. We therefore similarly reject the claim made here.

### 2. *Change of Plea*

■ On the third day of trial, defendant for the first time moved to enter a plea of not guilty by reason of insanity (hereinafter ngi plea). As grounds for the motion, counsel asserted that a pretrial examination by a psychiatrist appointed by the court at defense request had been inadequate because the examiner did not consider defendant's PCP use on the day of the crime.

Moreover, counsel claimed that the testimony of the Cardovas on the previous days of trial had for the first time alerted him to the possibility that defendant may have been insane at the time the offense was committed. The court denied the motion and defendant now argues that it used an incorrect standard in deciding the issue and abused its discretion.

■ Section 1016 provides in relevant part that "A defendant who does not plead not guilty by reason of insanity shall be conclusively presumed to have been sane at the time of the commission of the offense charged; provided, that the court may for good cause shown allow a change of plea at any time before the commencement of the trial." As the court observed in *People* v. *Boyd* (1971) 16 Cal.App.3d 901, 908 [94 Cal.Rptr. 575], changes of plea tendered *after* commencement of trial have long been given consideration to determine whether "good cause" exists to permit entry of the new plea. (See, e.g., *People* v. *Egan* (1933) 218 Cal. 408 [23 P.2d 755]; *In re Kubler* (1975) 53 Cal.App.3d 799, 806 [126 Cal.Rptr. 25].) At issue here is what "good cause" must be shown.

■ At the time of trial the established standard for reviewing requests to change pleas once trial had begun included an inquiry into whether "there were reasonable grounds to believe that at the time of the commission of the crime [the defendant] was legally insane . . . ." (*People* v. *Morgan* (1935) 9 Cal.App.2d 612, 615 [50 P.2d 1061].) Defendant asserts that the more restrictive standard enunciated in *People* v. *Lutman* (1980) 104 Cal.App.3d 64 [163 Cal.Rptr. 399], precluding inquiry into the merits of the proposed defense, should be retroactively applied.[1]

The *Lutman* court held that following our decision in *Prudhomme* v. *Superior Court* (1970) 2 Cal.3d 320 [85 Cal.Rptr. 129, 466 P.2d 673], the trial court could not consider the merits of an insanity defense when deciding whether to permit a change of plea. We held in *Prudhomme* that it was a violation of a defendant's right against self-incrimination to permit a prosecutor to obtain pretrial disclosure of information which "conceivably might lighten the prosecution's burden of proving its case in chief." (2 Cal.3d at p. 326; *People* v. *Lutman, supra,* 104 Cal.App.3d at p. 67.) The Court of Appeal therefore reasoned that it was error to require a defendant wishing to change his plea to make an "additional showing" on the merits of his proposed defense beyond a showing of good cause for delay, because such a requirement would violate the rights at issue in *Prudhomme*.

[1]On the day after *Lutman* was decided, another Court of Appeal district reapplied the historical test, considering both diligence in bringing the motion *and* reiterating the requirement that the defendant make some showing on the merits. (*People* v. *Herrera* (1980) 104 Cal.App.3d 167, 173 [163 Cal.Rptr. 453].)

In *Lutman,* the standard for determining insanity had changed after the defendant entered his plea (see *People* v. *Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318]) and defense counsel sought to add a new ngi plea as soon as he learned of the new standard. The trial court was "satisfied with [defendant's] diligence," but denied the request on the ground that no showing had been made on the merits of the defense. (*People* v. *Lutman, supra,* 104 Cal.App.3d at p. 67.) The Court of Appeal reversed on the ground that defendant had adequately demonstrated "to the satisfaction of the trial court and to this court" that he had "a plausible reason for delay in tendering [his] plea," and thus had made the only necessary and proper showing to obtain relief under section 1016. (*Id.,* at p. 68.)

Defendant here claims that the trial court similarly erroneously denied his motion on the ground that there was an insufficient showing on the merits of his proposed defense. However, his claim must fail even under the *Lutman* standard, because the court also initially considered defendant's diligence in seeking to enter the plea and concluded it was lacking.

The court carefully considered defendant's claim that he had been unaware of any basis for an ngi plea until after the Cardovas' testimony. The judge announced that he had read the preliminary transcript and that the testimony of Tom Stinnett then had been "just as strong as anybody else, he said [defendant] was crazy, he said he was under the influence of a drug in response to a direct question . . . ." He also observed that defendant never responded to the prosecutor's claim that defense counsel had had copies of Victor Cardova's statements from an early pretrial stage in the case and that these statements were essentially the same as Cardova's trial testimony. Moreover, while defense counsel asserted he had not been able to have his investigator talk with the Cardovas until the day of trial, he failed to dispute the prosecutor's observation that two appointments had been set up before then which the investigator had failed to keep.

After the court reiterated that the testimony on defendant's mental state could not be a surprise because essentially it had all been revealed in information available pretrial to defense counsel, counsel then shifted emphasis to his claim that the psychiatrist's examination was inadequate. This examination however was undertaken at the request of *defense counsel* to whom the results were reported. Moreover, the doctor, called to testify *by the defense* during the hearing on the motions, stated that he did not discuss with defendant his PCP use or state of mind on the day of the crime because defendant "indicated that he did not want to discuss what happened that day and that he knew nothing about it . . . ." This was confirmed by defendant's own testimony during the motion hearing regarding the extent of his conversation with the psychiatrist. Finally, the psychiatrist also testified that

even had he known of defendant's alleged PCP use, it would not have altered his conclusion that "at the time I examined him [he did not] show any evidence of any mental illness that would cause him to lose a substantial capacity to evaluate his acts or control his acts."

The court ultimately denied the motion on the ground that no showing of any indication of legal insanity had been made. But long before that point, the judge had stated that "There is no question under the old case law, it seems to me that perhaps you could deny it on the basis that it's untimely and particularly in this case because as I have stated for the record none of this information is new . . . there is no surprises [sic] here, so it seems to me just on that basis that the motion could be denied." Thus, the court separately considered defendant's lack of diligence, and then turned to whether there was some showing on the merits that, under the circumstances, would still make entry of the plea at that late date appropriate. No such showing was made and the motion was denied on that basis as well. It appears that even under the standard applied in *Lutman,* using the more limited scope of inquiry into diligence alone, no error occurred. The trial court carefully considered the evidence and arguments submitted on behalf of the motion and did not abuse its discretion in denying it (see *People* v. *Cartwright* (1979) 98 Cal.App.3d 369, 386 [159 Cal.Rptr. 543] [trial court decision should be overturned only upon a showing of abuse of discretion]).

Underlying this contention is the suggestion that trial counsel provided ineffective assistance by not timely advancing an ngi plea at an earlier stage. Such a claim can best be adjudicated in a habeas corpus proceeding where evidence could be produced to show that the asserted failure deprived defendant of a meritorious defense. (See *In re Kubler, supra,* 53 Cal.App.3d 799; see also *People* v. *Mozingo* (1983) 34 Cal.3d 926, 934 [196 Cal.Rptr. 212, 671 P.2d 363].) Nothing in the record presently before us suggests that defendant was legally insane at the time of the offense, or that counsel's asserted lack of diligence amounted to a denial of effective assistance of counsel. (See *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

### 3. *Photographs*

Defendant asserts that the trial court failed to exercise its discretion pursuant to Evidence Code section 352 in deciding whether to grant his motion to exclude various photographs from evidence. He further argues that even if this court undertakes the weighing process required under that provision, it should find that the photos' prejudicial effect outweighed their probative value, and they were at best cumulative evidence.

This contention rests on our discussion in *People* v. *Green* (1980) 27 Cal.3d 1, 24-27 [164 Cal.Rptr. 1, 609 P.2d 468], where we considered whether the trial court had properly weighed the probative value and prejudicial effect of a statement by the victim to which a witness was prepared to testify. We found that the record did not show that the court had "discharge[d] its statutory duty" by performing a balancing test. Instead, it had "simply ruled that it would deny defendant's motion . . . ." (*Id.*, at p. 24.)

In our case, after defense counsel observed that his motion was "a 352 question," the court responded "Yes, it's a discretionary thing . . . ." The prosecutor then briefly argued the photographs' relevancy and the court asked to see them. Following defense counsel's claim that the photographs, showing the victim "cut from ear to ear" and a great deal of blood, were unnecessary, prejudicial, and not relevant to the extent there was no dispute as to the cause of death, the court stated "motion denied" and went on to consider other matters.

We reiterated in *People* v. *Green, supra,* that "on a motion invoking [§ 352 grounds] the record must affirmatively show that the trial judge did in fact weigh prejudice against probative value . . . . [T]he reason for the rule is to furnish the appellate courts with the record necessary for meaningful review of any ensuing claim of abuse of discretion; an additional reason is to ensure that the ruling on the motion 'be the product of a mature and careful reflection on the part of the judge,' . . ." (27 Cal.3d at p. 25.)

Here, there is evidence that the trial court understood and undertook its obligation to perform the weighing function prescribed by Evidence Code section 352. The judge expressly referred to his discretion, looked at the photographs before making his decision, and listened to argument. He did not explicitly state the factors and his assessment thereof in making his decision, but under the circumstances, in this pre-*Green* trial, the reflection thus demonstrated was sufficient.

Even if it were not, as in *Green,* "[d]efendant nevertheless fails to demonstrate that the error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.)" (27 Cal.3d at p. 26.) The photographs showed the victim in his residence but were not unusually gruesome; it is indisputable that photographs of a murder victim killed by violent means are likely to be less than pleasant. However, the photographs were not taken at close range, nor was there particular focus on the wounds. As the People argue, the photographs were relevant to demonstrate to the jury the physical surroundings of the crime, as well as the manner in which the wounds were inflicted.[2]

---

[2]It should be noted that the jury found not to be true the alleged special circumstance that "The murder was especially heinous, atrocious or cruel, . . ."

(*People* v. *Fields* (1983) 35 Cal.3d 329, 372 [197 Cal.Rptr. 803, 673 P.2d 680]; cf., *People* v. *Turner* (1984) 37 Cal.3d 302, 320-321 [208 Cal.Rptr. 196, 690 P.2d 669].) Therefore, even if the record is deemed not to reflect sufficiently an adequate weighing process by the court, no basis for reversal appears.

### 4. *Felony-murder Rule*

Defendant urges abandonment of the felony-murder rule in California. However, we recently reexamined this doctrine in *People* v. *Dillon* (1983) 34 Cal.3d 441, 450 [194 Cal.Rptr. 390, 668 P.2d 697], and reaffirmed its application, finding it "a creature of statute" which could not be abrogated by the courts and rejecting the various constitutional challenges raised. No reason to alter that conclusion is presented here.

### SPECIAL CIRCUMSTANCES

### 1. *Carlos-Garcia: Intent to Kill*

In *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], we concluded that the felony-murder special circumstance (§ 190.2, subd. (a)(17)) necessarily requires proof that the defendant intended to kill. In the course of so deciding, this court read subdivision (b) of section 190.2 as "imposing an intent to kill requirement for the accomplice to any felony murder, and by implication such a requirement for the actual killer himself." (P. 142.)

In the instant case, defendant contends that the jury was not required to find that he intended to kill his victim and that exceptions to the holding in *Carlos,* as enunciated in *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], similarly do not apply. He therefore asserts that the jury's special circumstances findings must be set aside.

In *Garcia,* after holding that *Carlos* applied to all cases not yet final (36 Cal.3d at p. 550), which would include this case, we described four exceptions which, when present, would obviate the need for reversal when *Carlos* error had occurred. We now consider the application of those exceptions here.

Two of the exceptions to the per se reversal rule of *Carlos* are clearly inapplicable. The failure to instruct on the issue of intent to kill did not arise " 'in connection with an offense for which the defendant was acquitted . . .' " nor was it irrelevant to " 'the offense for which he was convicted.' " (*People* v. *Garcia, supra,* 36 Cal.3d at p. 554, quoting *Connecticut* v. *John-*

*son* (1983) 460 U.S. 73, 87 [74 L.Ed.2d 823, 834, 103 S.Ct. 969, 977-978].) Neither did defendant concede the issue of intent. (*Ibid.*)

The third exception is based on our explanation in *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913], that "in some circumstances it is possible to determine that although an instruction . . . was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant . . . ." (Quoted in *People* v. *Garcia, supra,* 36 Cal.3d at pp. 554-555.) The importance of this exception in the context of the 1978 death penalty initiative was stressed in a footnote which explained that "[I]f a correctly instructed jury found intent to kill under some other special circumstance, the failure to instruct on intent to kill under the felony-murder special circumstance might not be reversible error." (*Id.,* at p. 555, fn. 11.) Here, the jury found true the special circumstance that "the murder was intentional and carried out for financial gain." (§ 190.2, subd. (a)(1).)

Petitioner nonetheless claims that under our holding in *People* v. *Murtishaw* (1981) 29 Cal.3d 733 [175 Cal.Rptr. 738, 631 P.2d 446], the finding that "the *murder* was intentional" was insufficient; the jury still was not required to find that the defendant had an intent to *kill.* In *Murtishaw,* we considered instructions given to a jury asked to adjudge a charge of assault with intent to commit murder. Reiterating that such a charge required proof of intent to kill (pp. 764-765), we found that the court's instructions were contradictory because they "defined the mental element essential to the crime in two different ways—intent to kill and intent to murder—and by implication defined the latter to include forms of murder not requiring an intent to kill" (p. 763). We were concerned there with the distinction stressed in *People* v. *Mize* (1889) 80 Cal. 41, 43: " 'To constitute murder, the guilty person need not intend to take life; but to constitute an attempt to murder he must so intend.' [Citation.]" (*Murtishaw,* 29 Cal.3d at p. 764.)

Here, however, the jury was required to find that "the murder was intentional . . . ."[3] In other words, it was a murder in which the victim's death was intended. "By implication," the language indicated that certain murders are *un*intentional and that the jury could not find the special circumstance applicable if the murder was of such a nature. This distinction and the

---

[3]The list of special circumstances contained in section 190.2, subdivision (a), uses the terms "murder was intentional" and "intentionally killed" without any apparent distinction other than grammatical convenience. Nothing indicates that the use of one phrase rather than the other was intended to have any significance for any purpose.

necessity that the jury find a specific intent to kill in order to find that this special circumstance was true was also clearly outlined and emphasized in the prosecutor's closing argument.[4] Moreover, the instructions given to the jury regarding intention for its use in distinguishing between degrees of homicide were couched solely in terms of *intent to kill.* Unlike the situation in *Murtishaw,* requiring the jury here to find that the murder was intentional directed it to determine whether the defendant intentionally sought the victim's *death;* no other possible distinction can be drawn between intentional and unintentional murders in this context.[5]

Because we conclude that the *Sedeno* exception applies, therefore making reversal under *Carlos* unnecessary, we need not consider whether the socalled *Cantrell-Thornton* rule explained in *Garcia* (36 Cal.3d at pp. 555-556) may also apply.

### 2. *Interpreting Section 190.2, Subdivision (a)(1)*

In *People* v. *Bigelow* (1984) 37 Cal.3d 731 [209 Cal.Rptr. 328, 691 P.2d 994], we considered the application of section 190.2, subdivision (a)(1), the special circumstance requiring a finding that "the murder was intentional and for financial gain." We interpreted our duty as requiring us to construe special circumstances in a manner to avoid duplication and determined that a narrow construction of this provision was required to escape overlap with the felony-murder special circumstance. As a result, we adopted "a limiting construction under which the financial gain special circumstance applies only when the victim's death is an essential prerequisite to the financial gain sought by the defendant." (P. 751.)

As in *Bigelow,* this narrow construction precludes application of this special circumstance here, leading us to hold that the trial court erred in submitting it to the jury. The *Bigelow* court did not consider how prejudice from this error should be assessed, and we intend to follow the same course because the penalty judgment must be reversed on other grounds. This hold-

---

[4]The prosecutor informed the jury that "There are a number of special circumstances . . . . One is the charge that the defendant intentionally murdered, the murder was intentional and carried out for financial gain. You can draw that inference I think from the testimony here. The other is that the murder was committed while the defendant was engaged in a robbery. And again that does not require an intent to kill. It is a different statement as to those special circumstances. The first special circumstance is intentional, carried out for financial gain. And the second is that it occurred while the defendant was engaged in a robbery. It does not require a special or specific intent to kill." Defense counsel's argument was primarily directed at the diminished capacity defense and he did not specifically allude in relevant fashion for our purposes to the special circumstances alleged.

[5]The analogous situation in *Murtishaw* would have arisen had the jury been instructed to find an intent to commit *intentional* murder, rather than simply an intent to commit murder.

ing does not, however, detract from our previous discussion where we relied upon this provision in applying *Carlos-Garcia* here. The defect in the use of this special circumstance found in *Bigelow* does not nullify the validity of the finding that "the murder was intentional."

PENALTY PHASE[6]

1. *The Briggs Instruction*

 The penalty jury was instructed that the "Governor is empowered to grant a reprieve, pardon or commutation after sentence following conviction of a crime. Under this power, a Governor may in the future commute or modify a sentence of life in prison without the possibility of parole to a lesser sentence that would include the possibility of parole." In *People v. Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430] (*Ramos II*), upon remand from the United States Supreme Court, we held that under the California Constitution, this instruction, known as the Briggs Instruction, was so misleading as to constitute a denial of due process.

In this case, the Briggs Instruction was given without qualification. Under compulsion of the decision in *Ramos II,* we therefore hold that the penalty judgment must be reversed and that a new penalty trial must be held during which the instruction should not be given. (37 Cal.3d at p. 159.)

2. *Sympathy Instruction*

 The jury was instructed at the penalty trial pursuant to CALJIC No. 1.00 (1979 rev.) that "You must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." Identical language was used to instruct the jury in *People* v. *Easley* (1983) 34 Cal.3d 858, 875 [196 Cal.Rptr. 309, 671 P.2d 813], and *People* v. *Lanphear* (1984) 36 Cal.3d 163, 165 [203 Cal.Rptr. 122, 680 P.2d 1081]. In both of those cases, this court held that giving the instructions constituted error because to do so denied the defendant the right to have the jury consider any relevant "sympathy factor" in his behalf. Nor was the problem cured by the instructions regarding mitigating factors. In *Lanphear,* the majority expressly concluded that retrial was constitutionally mandated because of the potential ambiguity engendered by the instruction. (36 Cal.3d at p. 169.) Retrial therefore is required here.

---

[6]My own views regarding the bases for reversal of the penalty judgment are consistent with the dissents in the relevant cases. However, the current majority view is to the contrary and controls the disposition here.

### 3. *Predictions of Future Violence*

Dr. Siegel testified during the penalty phase that the prognosis of defendant's future conduct were he to be released from prison "would not be good. I see no indication of any improvement over the years with the defendant's problems and his perceptions of them. He shows relatively poor insight into them, [and] has strong denial for a lot of his behavior. I see no indication, nor do I know of any rehabilitative efforts that would be successful in correcting this personality of violent and impulsive behavior."

In *People* v. *Murtishaw, supra,* 29 Cal.3d at page 767, we concluded that a similar prediction of future conduct by the same expert witness was unreliable and should not have been permitted over objection. We found admission of the testimony prejudicial under any standard because it composed "the principal prosecution penalty phase evidence." (P. 775.) Defendant's situation differs from that in *Murtishaw* because he failed to object to introduction of Siegel's statement and because this evidence did not form the major thrust of the prosecutor's case at the penalty phase.

Our critique of such evidence in *Murtishaw* as being unreliable and "probably wrong," appears to apply; under the circumstances, however, in the absence of an objection, reversal on this basis might not be warranted. Nonetheless, we need not further consider this issue because reversal is already required on alternate grounds.

### 4. *Additional Claims*

Defendant raises several additional grounds for reversal, most of which involve conduct or rulings which will not necessarily recur at retrial and we therefore do not address them.

### Conclusion

The judgment of guilt is affirmed as to all counts, the special circumstances finding pursuant to section 190.2, subdivision (a)(1), is set aside, and the judgment as to penalty is reversed. The cause is remanded to the superior court for a retrial of the penalty phase in accordance with the views expressed herein.

Mosk, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

**KAUS, J.**—I concur. I agree that it is appropriate to apply the *Sedeno* exception in this case to "cure" the *Carlos* error. There may, however, be other situations in which application of *Sedeno* would be inappropriate. In

a capital case the defendant's paramount concern is, of course, to avoid a death sentence. Thus there may well be instances in which the record shows that as a result of the defendant's pre-*Carlos* impression that the People need not prove intent to kill as an element of a felony-murder special circumstance, the defendant decided to forego any attempt at raising a reasonable doubt on intent to kill in connection with some other charge, believing that his only chance to escape a death sentence lay in avoiding the felony-murder charge altogether. There may also be cases in which it appears that the defendant decided against contesting intent to kill as a result of an erroneous trial court ruling. (See, e.g., *People* v. *Ramos* (1984) 37 Cal.3d 136 at pp. 147-148, fn. 2 [207 Cal.Rptr. 800, 689 P.2d 430].) When the record thus establishes that the defendant did not present relevant evidence on intent because of a mistake as to the applicable legal principles, it would, of course, be inappropriate to apply *Sedeno*.

In this case, however, there is no indication in the record that defendant failed to contest the intent-to-kill issue because of his mistaken belief that the robbery-murder special circumstance would trigger a penalty trial in any event. If defendant has evidence which he withheld because he was misled on the significance of the intent-to-kill issue, he may, of course, seek to present it in a habeas corpus proceeding.

Bird, C. J., Broussard, J., and Reynoso, J., concurred.

Appellant's petition for a rehearing was denied October 31, 1985.