Filed 9/25/23  P. v. Timmons CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br>        Plaintiff and Respondent,<br>v.<br><br>WILLY TUJAYS TIMMONS,<br>        Defendant and Appellant. | A165343<br><br>(Lake County<br>Super. Ct. No. CR949130) |

A jury found defendant Willy Tujays Timmons guilty of second degree murder (Pen. Code, §§ 187, subd. (a), 189, subd. (b))[1] and other crimes related to the brutal killing of his former domestic partner.  His sole contention on appeal is that the trial court erred when it refused to allow him to enter a plea of not guilty by reason of insanity to the charges in the latest indictment filed against him.  We agree, and we therefore reverse the order denying the request to enter a plea of not guilty by reason of insanity.  The judgment is affirmed insofar as it adjudicates defendant's guilt.

## BACKGROUND

On June 30, 2017, defendant bludgeoned his domestic partner and

_____

[1] Further undesignated references are to the Penal Code.

1

mother of his children to death by repeatedly striking her head with a rock. Defendant admitted to police, "I hurt [her] bad. I'm going away for a long time." A psychologist who examined defendant in late 2017 found he exhibited symptoms of schizophrenia, paranoid type, with delusions, as well as of methamphetamine use disorder.

On December 13, a Lake County grand jury returned an indictment ("first indictment") charging defendant with murder (§ 187, subd. (a)) (count one); infliction of corporal injury on a former cohabitant and mother of the offender's child within seven years of being twice convicted of violating section 243, subdivision (e)(1) (battery against a cohabitant or mother of the offender's child) (§ 273.5, subds. (a), (f)(2)) (count two); aggravated mayhem (§ 205) (count three); and torture (§ 206) (count four). As to count two, the indictment alleged defendant used a deadly and dangerous weapon in the commission of the offense (§ 12022, subd. (b)(1)) and personally inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)). As to count four, it was alleged that defendant had suffered a prior serious or violent felony (§§ 667, subd. (d), 1170.12, subd. (b)).

At arraignment, the trial court appointed Thomas Quinn as counsel for defendant. Defendant entered dual pleas of not guilty and not guilty by reason of insanity (NGI) to all counts.

The court subsequently appointed two doctors to assess defendant's mental status, pursuant to section 1027. However, at a hearing on March 6, defendant stated he would not agree to an assessment.

Meanwhile, defendant filed a motion to dismiss the first indictment under section 995. But before the motion could be heard, the Lake County District Attorney had convened another grand jury, which then issued

another indictment on July 26, 2018 ("superseding indictment").[2] The superseding indictment charged defendant with premeditated first degree murder in count one (§ 187, subd. (a)) and alleged the special circumstance that the murder was intentional and involved the infliction of torture (§ 190.2, subd. (a)(18)). The offenses charged in counts two, three, and four remained the same as in the first indictment. As to count two, the superseding indictment alleged defendant personally inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)). And as to all counts, it was alleged defendant used a deadly and dangerous weapon in the commission of the offenses. (§ 12022, subd. (b)(1).)

On August 28, 2018, defendant was arraigned on the superseding indictment. Defense counsel Quinn requested a continuance "to research the possibility of a [d]emurrer given the procedural posture of this case and yet another second [i]ndictment being filed while the other one is pending." Quinn then stated that defendant "pleads not guilty to the Indictment filed on July 26, 2018."

The court (Judge Stephen O. Hedstrom) asked the prosecutor, "[W]hat's the People's position on what, if anything, should be done with the first

---

[2] Consistent with the parties' briefing, we refer to the indictment filed on July 26, 2018 as the "superseding indictment." As would be seen at the arraignment that followed, a question arose regarding the procedural effect that the second indictment had on the first indictment. Although the trial court stated its understanding that under the law the second indictment superseded the first, it invited the parties to brief the issue. However, the record does not show that the issue was raised by the parties in subsequent proceedings and therefore that it was conclusively resolved by the court. It appears that the parties proceeded under the assumption that the first indictment was superseded by the more recent indictment, as they referred to the latter as the "superseding indictment" throughout the proceedings. Likewise in their appellate briefs.

3

Indictment, the one that was filed on December 13, 2017?" The prosecutor replied, "This is filed under the same case number. It's just a consolidated Indictment. I don't think there will be a dismissal." The court then stated, "[T]his is the first time I've really seen something quite like this," to which defense counsel responded, "There just can't be two. I see no authority for having two Indictments." The court then indicated it would continue the matter and in the meantime, the parties can "research it" and the defendant "can make [a] motion."

Quinn then interjected: "Your honor, at this time—my client pointed out to me in the . . . previous Indictment, he had pled guilty and not guilty by reason of insanity. So . . . he enters those pleas again, to keep the case in the same posture it was previously." The court replied, "With respect to a plea of not guilty by reason of insanity, . . . well I could take that today, but I'd have to go back to the books. We'll just deal with that also [at the next hearing]."

Quinn reminded the court that there was already a pending motion to dismiss the first indictment. The court replied: "Well, I'm reasonably sure the law is clear that the most recent Indictment supersedes that, the original Indictment." However, it reiterated, "you're going to have plenty of time to research that when we handle it on the [next] hearing" and "you can address that in your moving papers." The court set the next hearing for October 2.

The minutes for the August 28 hearing state: "The defendant enters a plea of not guilty to all counts on the 2nd Indictment. The defense started to enter a plea of not guilty by reason of insanity but did not at this time."

The October 2 hearing was continued several times, and during the continued hearings, the court addressed a number of issues, including discovery and defendant's motion to dismiss. The record does not show that defendant or Quinn raised the issue of entering an NGI plea at these or any

4

other proceedings.

On February 8, 2019, defense counsel filed a motion to dismiss the superseding indictment, which motion the court denied on May 29.[3]

On November 13, defendant brought the first of three *Marsden*[4] motions. Finding "there has been a complete breakdown in the relationship between Mr. Quinn and Mr. Timmons which would make it impossible for Mr. Quinn to effectively represent Mr. Timmons," the court granted the motion. The court relieved Quinn as counsel and appointed attorney Anakalia Sullivan to represent defendant.

Over one year later, defendant brought his second *Marsden* motion. The court granted the motion, reasoning: "this is a special circumstances case. Mr. Timmons is facing life without the possibility of parole. An attorney does have a duty to communicate with her client. From what both Mr. Timmons and Ms. Sullivan have said, since January [2020] there's been one meeting that was 15 minutes. Fifteen minutes in 11 months is—I find that that's not proper representation. So I do find that Ms. Sullivan has not properly represented Mr. Timmons and continued representation by her will deprive him of his right to effective assistance of counsel." The court relieved Sullivan as counsel and appointed Mitchell Hauptman to represent defendant.

On July 7, 2021, defendant brought his third *Marsden* motion. He argued that "Mr. Hauptman has pretty much neglected this case. He hasn't returned phonecalls [*sic*]. . . . [T]here doesn't seem to be any involvement in

---

[3] The motion did not address the procedural issue pertaining to the effect of the superseding indictment on the first indictment. Also, the record does not indicate the outcome of the earlier motion to dismiss the first indictment.

[4] *People v. Marsden* (1970) 2 Cal.3d 118.

5

my own defense." Hauptman stated: "I have to agree with Mr. Timmons. It is an unusual position for me to take. I don't mean to dodge the work, but as a matter of fact, I have seen him only once. I have been ignoring phonecalls [*sic*] that have been made on his behalf. I have declined to pursue needs that he suggested are appropriate. And I generally find myself beyond the similar malaise of the Covid most—just not really able to focus or get involved in this particular case. And I did discuss that with Mr. Timmons. It just seemed unfair to have a lawyer quite as disinterested as I find myself." The court granted the motion and appointed Thomas Feimer to represent defendant.

On October 15, attorney Feimer filed a motion to continue trial, then scheduled for October 20. In his supporting declaration, Feimer stated there had been a COVID-19 outbreak at the jail, and defendant was quarantined during the outbreak. Feimer had spoken with defendant over the phone several times. Although he also had an in-person visit with defendant at the jail, it was "through glass, and the telephone intercom system was subject to recording." As such, defendant was reluctant to candidly discuss his case. Further, Feimer stated he was informed and believed defendant suffered from schizophrenia, and therefore that he "is prone at times to paranoid thoughts or ideation" and that it was difficult for him "to speak fully and candidly about the charges and circumstances surrounding this case." For these reasons, Feimer stated he needed additional time to prepare the case for trial. After holding a hearing, the court denied the motion.

At the October 19 pre-trial conference, attorney Feimer informed the court that based on his review of the court's minutes in the case, "it appears that Mr. Timmons attempted to or did enter a not guilty by reason of insanity plea in 2018," and thus he "intends to enter that plea once again, to the extent that it is not entered currently."

6

The court stated it had reviewed the case file and found that no NGI appeared to have been previously entered to the charges in the superseding indictment. The court then ordered the parties to brief the issue.

Meanwhile, the trial remained as scheduled and began on October 20.

On October 25, five days after trial began, defense counsel filed a brief requesting entry of an NGI plea to the superseding indictment. In the brief, counsel argued the court "should proceed as if Mr. Timmons'[s] original NGI plea was never withdrawn" and even if the original NGI was withdrawn, good cause exists to permit him to enter a new one, pursuant to section 1016. Counsel argued, "[T]he minutes seem to indicate that Defendant originally entered a dual plea. It appears counsel began to enter such a plea to a superseding indictment but held off for reasons that are not clear upon the minutes, and then the matter was not taken up as the case was continued for [*sic*] multiple times. Defendant Timmons subsequently has had three additional appointed attorneys in this case, [three] of which were relieved after *Marsden* hearings. It is therefore plausible that Defendant Timmons never sought to abandon his NGI plea, believed than an NGI plea was, in fact, active in the case, and perhaps never even discussed the issue with successor counsel."

In support, counsel submitted the declaration of defendant's third attorney, Hauptman, who stated his belief that defendant had entered dual pleas of not guilty and NGI while previously represented by attorney Quinn, and that this plea was still in effect during the time that Hauptman represented him. Also, Hauptman stated that defendant had never expressed a belief that his NGI plea had not been entered in this case or that this plea was still not in effect. To the contrary, Hauptman believed that defendant anticipated a bifurcated trial on the issue of his sanity should he

7

be found guilty of the offenses charged in the superseding indictment.

The brief also attached the district attorney's handwritten notes for the August 28, 2018 arraignment, indicating "[defendant] pleads not guilty and not guilty by reason of insanity to be entered [at the next scheduled hearing]."

The record on appeal does not contain any opposition from the People to the request to enter the NGI plea.

On October 28, the court (Judge J. David Markham) held a hearing on defendant's request to enter the NGI plea to the superseding indictment. Attorney Quinn and defendant testified as follows.

Quinn recalled that defendant had entered a plea of NGI "on a couple of occasions." Quinn explained that the case "became procedurally convoluted" because "we don't really do grand juries too often in this county, and in this case we did two of them. And if that plea was not entered at some subsequent time . . . when it should have been entered, . . . and I'm not saying that that happened, but if the record shows that omission, it was entirely an oversight." Quinn confirmed defendant never expressed a desire to proceed in "any other different way." He also testified that defendant's resistance to being evaluated by the court-appointed doctors early on in the case was a tactical issue about how to present the NGI defense, and not an indication that defendant did not want to plead NGI.

Like Quinn, defendant recalled that he had entered NGI pleas on at least on two occasions in 2018. He testified, "My understanding was it was an NGI defense the whole time." Defendant further testified he had discussed the NGI defense with attorney Hauptman.

The court then asked defendant if any time after the August 28, 2018 arraignment he had told Quinn that he wanted to enter an NGI plea.

8

Defendant responded, "I don't remember doing that, but it was not like I got to talk to him that often. I didn't get to talk to him after that day. . . . I think it might have just got kind of lost or shuffled under the rug kind of in the mind." Defendant also stated he did not tell any of his other attorneys that he wanted to enter a NGI plea, explaining he "didn't realize [he] had to" because he "thought it was already an NGI plea."

The court heard arguments from defense counsel Feimer, who stated: "at least on an equitable basis, if technically the original pleas of NGI aren't active because of a superseding indictment, at least on [defendant's] part, I mean . . . he's never really evinced a desire to withdraw them. One could argue, well, his lawyers didn't do anything in the intervening time to do that. However, I think it kind of ignores a basic reality that Mr. Timmons is not an attorney. That's why he has representation. NGI pleas are procedurally complex things. I think it's somewhat unjust to penalize him for not following the strict technical requirements of it." Counsel continued: "This would be something different if Mr. Timmons, after, you know, the length of this case all of a sudden and for the first time said, you know, 'I want to do an NGI plea.' . . . [T]his isn't even that situation. He wanted to do it. He's had four attorneys. And frankly, the issue—[three] of which I would note were relieved after *Marsden* hearings. I believe there were communications issues going on that were motivating some of those—some of those appointments of new counsel. [¶] I would argue that . . . if it got lost in the shuffle, this isn't because he's been, you know, delaying or trying to hide it. It just, you know, hasn't been frankly handled very well by his counsel up to this point. And that's not his fault, and I don't think he should be penalized for that."

Following this argument, the court announced its decision. It began with a summary of the applicable law, followed by a procedural history recap,

9

and after that, a lengthy discussion of why it found no "plausible reason" for the delay in tendering the plea.

The court explained that defendant's and his attorneys' beliefs—that an NGI plea to the superseding indictment had been entered at the August 28, 2018 arraignment, and therefore that there was no need for them to seek entry of the NGI plea afterwards—were inaccurate. The court confirmed from the record that defendant never actually entered a plea of NGI to the superseding indictment. Instead, what happened at the arraignment was that defense counsel at the time, Quinn, reminded the court that defendant had already entered pleas of not guilty and NGI to the first indictment and that he wished to enter those pleas again to the superseding indictment. The court did not take the NGI plea, and deferred the entry of the plea to the next hearing. However, neither defendant nor Quinn or his second and third attorneys raised the issue to the court; it was not until the day before trial that attorney Feimer brought the issue to the court's attention. Thus, the court concluded that any belief that an NGI plea to the superseding indictment had been entered was not supported by the record.

The court then stated: "At best, the evidence . . . shows that counsel for the defendant, former and current, secretly harbored a belief that an NGI plea had been entered. This case was headed toward a trial that would include a sanity phase. And knowing this, counsel failed to discuss this matter with his or her client and failed to prepare for the trial on the issue of sanity."

However, in the following paragraphs, the court refused to accept that counsel could have held such a belief. It questioned why, if they believed an NGI plea had been entered, would "none of them take some sort of action" towards preparing for a sanity trial. In the next paragraph, the court stated,

10

"If I were to find any of defendant's attorneys were so incompetent that they believed . . . there was going to be a sanity trial without having to [conduct a list of tasks related to preparing for a sanity trial], such a finding would be based on speculation.  There's certainly no evidence of that happening.  If that did in fact happen . . . any of the attorneys involved . . . would have submitted a declaration or offered testimony admitting to his or her incompetence in that regard as they are duty bound to do so."

Turning to defendant's conduct specifically, the court found that "defendant certainly knew another NGI plea was required to be entered on the new indictment."  It also found that "defendant could have raised this issue at any time," because he "has raised concerns to the Court on multiple occasions and requested at least three *Marsden* hearings."  Thus, "[i]f he wanted to enter an NGI plea, he certainly would have communicated to this Court."  In the court's view, "[t]he failure to enter an NGI plea falls squarely on the shoulders of the defendant."

The court then addressed Quinn's testimony, stating that Quinn was incorrect in his belief that an NGI plea to the superseding indictment had been entered.  However, the court did not "fault Mr. Quinn for that."  It "believe[d] Mr. Quinn intended on raising that issue with the defendant again had he stayed in the case, but he was relieved."

The court then summarized its findings as follows:

"The defendant did not believe he had entered an NGI plea in this case.

"No counsel had informed him he entered an NGI plea in this case or that there would be a sanity trial in this case absent the entry of such a plea.

"The defendant was aware that if he wanted to try the issue of sanity, he would have to enter an NGI plea in open court to the current indictment.

"The defendant failed to inform the Court or his counsel that he wanted

11

to enter an NGI plea after his arraignment on the current indictment until October 19th, 2021, the day before trial.

"The defendant failed to discuss the issue of his NGI plea or lack thereof or the sanity trial with any of his counsel subsequent to Mr. Quinn.

"There is no plausible reason for the defendant's delay in tendering an NGI plea.

"Therefore, his request to enter an NGI plea is denied."

On November 17, the jury convicted defendant of the lesser offense of count one: murder in the second degree (§§ 187, subd. (a), 189, subd. (b)); infliction of corporal injury on a former cohabitant (§ 273.5, subd. (a)); aggravated mayhem (§ 205); and torture (§ 206). The jury also found true that each offense was committed by the use of a rock as a deadly weapon. The jury did not find true the murder special circumstance, and did not reach a verdict on the additional allegations as to count two that defendant committed the corporal injury offense within seven years of two convictions of prior domestic violence offenses.

On March 22, the court sentenced defendant to an indeterminate term of 15 years to life in prison for the murder conviction, plus a one-year determinate term for the deadly weapon enhancement. The court stayed execution of the sentence for the remaining counts pursuant to section 654.

This appeal followed.

## DISCUSSION

### Introduction

The main heading of the legal argument section in defendant's opening brief asserts: "Appellant Was Denied His Due Process Right to Present the Affirmative Defense of Insanity by a Combination of an Initial Judicial Postponement in Taking His Plea[s], Followed by Oversights by a Succession

12

of Trial Counsel,  and Completed by the Trial Court's Subsequent Refusal to Allow Appellant to Proceed On his Original Plea of Not Guilty By Reason of Insanity."  (Capitalization omitted.)[5]  Based on our review of the arguments in the subheadings, defendant's argument relies primarily on *McCoy v. Louisiana* (2018) 584 U.S. ___ [138 S.Ct. 1500] (*McCoy*).

In *McCoy*, defense counsel decided the best approach to avoiding a death sentence for the defendant was to concede his guilt to the alleged murders.  The defendant expressly objected to this strategy before the trial began and adamantly objected to the defense counsel's concession of guilt multiple times throughout the trial.  (*McCoy*, *supra*, 584 U.S. at p. ___ [138 S.Ct. at p. 1506].)  In holding that defense counsel's actions violated the defendant's Sixth Amendment rights, the United States Supreme Court explained that a defendant does not surrender all control of his or her defense when deciding to receive the assistance of counsel, and specifically, that "[a]utonomy to decide that the objective of the defense is to assert innocence" belongs to the defendant.  (*Id.* at p. ___ [138 S.Ct. at p. 1508].)  Therefore, "[w]hen a client expressly asserts that the objective of '*his* defen[s]e' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt."  (*Id.* at p. ___ [138 S.Ct. at p. 1509].)  The court further held the error was structural and remanded the matter for a new trial.  (*Id.* at p. ___ [138 S.Ct. at p. 1512].)

In addition to *McCoy*, defendant cites California statutory and case law recognizing that "a defendant has a personal right to enter whatever plea he or she wants, even if counsel believes that the plea is a poor tactical choice."

---

[5] Although defendant refers to counsel's "oversights," he does not argue, and we do not separately address, that such oversights violated his right to effective assistance of counsel.

13

(Citing, e.g., § 1018; *People v. Henning* (2009) 178 Cal.App.4th 388, 397; *People v. Clemons* (2008) 160 Cal.App.4th 1243, 1251.)

Defendant then argues that "[t]he record . . . makes clear that [he] did not personally withdraw his defense of insanity. The trial court's conclusion that it had been waived because he had not reentered it after the superseding indictment was filed was premised on a misunderstanding of the procedural history in this case and the law. [He] asked to re[e]nter his NGI plea but was rebuffed by the trial court who did not want to 'go back to the books' after trial counsel indicated he wanted to enter 'those pleas [of not guilty and NGI] again, to keep the case in the same posture as it was previously.'" Accordingly, he contends this case should be evaluated under the "structural error" standard, which standard he argues compels reversal in this case.

As we understand it, defendant's argument does not assert that any of his attorneys had taken any actions to override his personal autonomy to decide his defense and/or to plead NGI. To the contrary, as defendant's argument indicates, and the record shows, defendant and his attorneys were in agreement with respect to his decision to plead NGI. Therefore, we agree with the People that *McCoy* is not implicated here. (See *People v. Lopez* (2019) 31 Cal.App.5th 55, 66 ["we have found no authority, nor has appellant cited any, allowing extension of *McCoy*'s holding to a situation where the defendant does not expressly disagree with a decision relating to his right to control the objective of his defense."]; see also *People v. Burns* (2019) 38 Cal.App.5th 776, 784 ["*McCoy* is . . . predicated on a client's express objection to defense counsel's concession strategy"].) Likewise, the California authorities defendant cites regarding a defendant's right to enter a plea of his or her choice are inapposite.

Rather than an issue concerning a violation of defendant's personal

14

autonomy, we think the issue is more appropriately framed as whether the trial court abused its discretion in finding under section 1016 that there was no good cause to allow him to enter a plea of NGI to the superseding indictment—an issue defendant raises as an alternative to the *McCoy* issue. And conclude it did.

**The Law**

A defendant may plead not guilty to the substantive charges and deny any special allegations, and join that plea with a plea of NGI. (§ 1016, subds. (2), (6); see § 1026, subd. (a).) When an NGI plea is entered, the court conducts a bifurcated trial, and the issues of guilt and sanity are separately tried. (§ 1026, subd. (a); *People v. Hernandez* (2000) 22 Cal.4th 512, 520.) In the first phase of trial, the defendant is tried on his or her factual guilt without reference to the insanity plea. If the defendant is found guilty, he or she receives a second jury trial in which his or her legal sanity is determined. (§ 1026, subd. (a).)

"After a plea of not guilty by reason of insanity, a defendant may be examined by court-appointed and prosecution mental health experts to assist the jury in determining the defendant's sanity. (*People v. Williams* (1988) 44 Cal.3d 883, 961; see also §§ 1026, 1027.) The experts necessarily inquire into the defendant's conduct at the time of the offense because the defendant's account of his actions and thought processes can be critical to the formation of an expert's opinion. The inquiry, however, may also result in incriminating statements by the defendant that raise concerns about self-incrimination and the right to be represented by counsel." (*People v. Jantz* (2006) 137 Cal.App.4th 1283, 1294.)

A defendant who fails to plead not guilty by reason of insanity is presumed to have been sane at the time he or she committed an offense.

(§§ 1016, 1026, subd. (a); see *People v. Jefferson* (2004) 119 Cal.App.4th 508, 519.) However, a criminal defendant may change a plea to NGI after commencement of trial "for good cause shown." (§ 1016; *People v. Montiel* (1985) 39 Cal.3d 910, 921 (*Montiel*).)

Our Supreme Court in *Montiel* acknowledged that the Courts of Appeal have established varying standards for establishing "good cause" to change a plea to one of NGI. (*Montiel*, *supra*, 39 Cal.3d at pp. 921–923.) One of the standards is " whether 'there were reasonable grounds to believe that at the time of the commission of the crime [the defendant] was legally insane. . . .' (*People v. Morgan* (1935) 9 Cal.App.2d 612, 615 [(*Morgan*]).)" (*Montiel*, at p. 921.) However, a "more restrictive standard" was enunciated in *People v. Lutman* (1980) 104 Cal.App.3d 64 (*Lutman*). It held that section 1016 cannot be interpreted to require a defendant demonstrate the merits of his or her proposed insanity defense before being allowed to enter such a plea. (*Lutman*, at pp. 67–68.) Instead, *Lutman* concluded, "good cause" in section 1016 must be read as requiring a defendant to "show a plausible reason for delay in tendering any plea." (*Lutman*, at p. 68; *Montiel,* at p. 921.) "On the day after *Lutman* was decided, another Court of Appeal district reapplied the historical test, considering both diligence in bringing the motion *and* reiterating the requirement that the defendant make some showing on the merits. (*People v. Herrera* (1980) 104 Cal.App.3d 167, 173.)" (*Montiel*, at p. 921, fn. 1.) The Supreme Court in *Montiel* was able to determine the appeal before it without resolving that conflict because, in that case, the defendant had failed to show good cause under either the *Lutman* or *Morgan*/*Herrera* standard. (*Montiel*, at p. 923.)

The denial of a motion to enter a plea of NGI is reviewed for an abuse of discretion. (*Montiel*, *supra*, 39 Cal.3d at p. 923.) Our Supreme Court has

said that "[t]he abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711 (*Haraguchi*).) When the trial court's resolution of a question of law is challenged, we review its legal conclusion de novo. (*Id.* at pp. 711–712.)

As to the trial court's factual findings, we review them for substantial evidence. (*Haraguchi*, *supra*, 43 Cal.4th at p. 711; accord, *People v. Cluff* (2001) 87 Cal.App.4th 991, 998 ["A trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence"].) "Under the substantial evidence rule, a reviewing court will defer to a trial court's factual findings to the extent they are supported in the record." (*People v. Butler* (2003) 31 Cal.4th 1119, 1127; accord, *People v. Jones* (1990) 51 Cal.3d 294, 314.) However, deference is not abdication, and substantial evidence is not synonymous with any evidence. (See *People v. Superior Court* (*Jones*) (1998) 18 Cal.4th 667, 681, fn. 3.) Evidence is substantial only if it " 'reasonably inspires confidence and is of "solid value." ' " (*People v. Morris* (1988) 46 Cal.3d 1, 19, disapproved on another ground in *In re Sassounian* (1995) 9 Cal.4th 535, 543, fn. 5.) Further, "[t]he focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on ' " 'isolated bits of evidence.' " ' " (*People v. Cuevas* (1995) 12 Cal.4th 252, 261, citing *People v. Johnson* (1980) 26 Cal.3d 557, 577 (*Johnson*).) "Although we recognize our duty to 'view the evidence "in the light most favorable to the prosecution." ' . . . We must take care not to ' "affirm[] the trier of fact on isolated evidence torn from the context of the whole record [by] . . . leap[ing] from an acceptable premise, that a trier of fact could reasonably believe the isolated evidence, to the dubious conclusion that a trier of fact could reasonably rejected everything that controverted the

17

isolated evidence." ' " (*People v. Sanford* (2017) 11 Cal.App.5th 84, 95, citing *Johnson*, at p. 577.)

Finally, the trial court's "application of the law to the facts is reversible only if it is arbitrary and capricious." (*Haraguchi, supra,* 43 Cal.4th at p. 712; see *People v. Giminez* (1975) 14 Cal.3d 68, 72 ["[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered"]; see also *In re White* (2020) 9 Cal.5th 455, 470 ["[a]n abuse of discretion occurs when the trial court, for example, . . . fails to consider a relevant factor that deserves significant weight, gives significant weight to an irrelevant or impermissible factor, or makes a decision so arbitrary or irrational that no reasonable person could agree with it"].)

**The Trial Court Abused Its Discretion in Denying Defendant's Request to Enter a Plea of NGI to the Superseding Indictment**

Defendant argues the trial court abused its discretion in denying his request to enter an NGI plea, because he "made a sufficient showing" of good cause under section 1016, as construed in *Lutman*.[6]  We agree.  As noted, a trial court can abuse its discretion by making a ruling unsupported by substantial evidence (*Haraguchi, supra,* 43 Cal.4th at p. 711), or by making a decision that is arbitrary or irrational. (*Id.* at pp. 711–712; *In re White, supra*, 9 Cal.5th at p. 470; *People v. Giminez, supra,* 14 Cal.3d at p. 72.)  Both problems are present here.

As we read the trial court's statements at the hearing on defendant's

---

[6] The trial court only applied the *Lutman* standard.  It thus did not consider the merits of the proposed insanity defense as required under *Morgan* and *Herrera*.  However, defendant does not argue the court erred in choosing to follow *Lutman*.  In his brief below requesting entry of the plea and in his appellate briefs, he, too, cited only *Lutman* and did not mention *Morgan* or *Herrera* or otherwise argue the merits of his insanity defense. Thus, any claim of error with respect to the court's failure to apply both standards is foreclosed on appeal.

request to enter an NGI plea as a whole, one particular sentence lies at the heart of the court's decision: "The failure to enter an NGI plea falls squarely on the shoulders of the *defendant*." (Italics added.) By "defendant," the court apparently meant defendant personally, as distinct from his attorneys, as indicated by its comments faulting defendant for neglecting to inform his attorneys and the court that "he wanted to enter an NGI plea after his arraignment on the current indictment." The court found defendant could and should have raised the issue, because he "was aware that if he wanted to try the issue of sanity, he would have to enter an NGI plea in open court to the current indictment," and because he was in general capable of voicing his concerns. As now explained, we conclude the court's finding that defendant was solely at fault for the delay in raising the issue of the NGI plea is not supported by substantial evidence. The record as a whole indicates that defense counsel, as well as the court itself, also contributed to the overall delay.

According to the court, defendant was at fault for the fact the NGI plea was never entered, because he "certainly knew" "that if he wanted to try the issue of sanity, he would have to enter an NGI plea in open court to the current indictment," yet failed to raise that issue to the court after his August 28, 2018 arraignment. But the same reasoning applies, perhaps even more so, to defendant's attorneys, especially attorney Quinn, who was present at the August 28, 2018 arraignment. At that time, the court declined to take the plea and told the parties they would "have to deal with that" at the next hearing. Yet, neither Quinn nor any of defendant's subsequent attorneys (except for his most recent attorney, Feimer) ever raised the issue after the arraignment. Although some of them would later claim that their inaction was based on their belief that such plea had in fact been entered,

19

they did not take any steps to confirm their belief was accurate. As Quinn testified at the hearing on defendant's request to enter the plea, the fact that no NGI plea to the superseding indictment had been entered was "entirely an oversight."

Further, although the court admonished defendant for not bringing up the issue of the NGI plea to his attorneys or to the court after the arraignment, the court overlooked a significant fact in this case: the complete breakdown in communication between defendant and his attorneys. These communication problems persisted for several years during defendant's case and, for the most part, were *not* attributable to him. Because of this, defendant brought, and the court granted, three *Marsden* motions. In November 2019, the court granted defendant's request to relieve Quinn as counsel finding "there has been a complete breakdown in the relationship . . . which would make it impossible for [Quinn] to effectively represent [defendant]." Meanwhile, the COVID-19 pandemic hit, and in December 2020, the court relieved defendant's second attorney as counsel, finding she did not provide "proper representation," because she had only one 15-minute meeting with defendant in the 11 months she had been counsel of record. And similarly in July 2021, defendant's *Marsden* motion was granted as to his third attorney, who expressly agreed with defendant that he had only seen defendant once, had been ignoring his phone calls, and had not been able to focus on this case due to health issues.

Additionally, when attorney Feimer was subsequently appointed, he had just three months to review the case and prepare for trial. According to his declaration, during this time, Feimer, too, faced communication challenges, due to among other things a COVID-19 outbreak and quarantine at the jail and defendant's resistance to discussing his case for fear of being

20

recorded at the jail.

The record thus shows that defendant could not communicate adequately or at all with his attorneys throughout his case. As defendant testified, "it was not like I got to talk to [attorney Quinn] that often. I didn't get to talk to him after [the August 28, 2018 arraignment]." The same is true with respect to his second and third attorneys and, to a lesser extent, his fourth attorney. It is not difficult to imagine defendant was hard pressed to make informed decisions about the exercise of his legal rights including pursuing an insanity defense, much less actually effectuate those rights on his own.[7] Under these circumstances, the court's finding that defendant

---

[7] According to a February 2023 report commissioned by Lake County, authored by the Sixth Amendment Center, and cited by defendant in his reply brief, "It is reportedly common in Lake County for indigent defendants to [bring *Marsden* motions] . . . because the defendant says their appointed . . . attorney 'never talk[s] to them at the jail, never visit[s], or never talk[s] to witnesses.' Stakeholders explain that '*Marsden* motions happen all the time' and 'almost everyone gets a *Marsden* filed against them once every several months.' One . . . attorney [with the Lake Indigent Defense LLP, a partnership of private attorneys that contracts with Lake County for appointment of counsel for indigent defendants] reports that in Lake County they 'have been *Marsden*-ed more times than [they] can count' and more than in any other California county during their years of criminal defense practice." (The Sixth Amendment Center, The Right to Counsel in Lake County, California: Evaluation of Trial-Level Indigent Representation Services (Feb. 2023) <https://sixthamendment.org/6AC/6AC_ca_LakeCountyReport_2023.pdf> [as of Aug. 6, 2023], p. 8.) "Despite counsel being appointed, the greatest difficulty experienced by indigent defendants is in communicating with their appointed attorneys, as expressed by criminal justice system stakeholders throughout the evaluation. It is most often the situation that appointed subcontractor attorneys meet with their clients only on the dates of scheduled court proceedings, and often the only attorney-client conversations occur during the court proceedings. This causes confusion and frustration for indigent defendants, impeding their ability to make informed decisions about

21

alone was to blame for not ensuring the entry of an NGI plea cannot be squared with the record.

Furthermore, the trial court was not entirely blameless. At the August 28, 2018 arraignment, defense counsel expressly requested the court to permit defendant to enter pleas of not guilty and NGI to the superseding indictment. The court stated that it "could take that today, but [it] would have to go back to the books," which meaning is not entirely clear. Regardless, as the court itself stated, it could have taken the plea at that time but just chose not to. It also did not revisit the issue afterwards either.

Accordingly, the court's determination that "[t]he failure to enter an NGI plea falls squarely on the shoulders of the defendant" is not supported by substantial evidence. It was based "on isolated evidence torn from the context of the whole record." (*Johnson, supra,* 26 Cal.3d at p. 577.) Because the court placed great reliance on this factual misconception in finding there was "no plausible reason for the delay in tendering an NGI plea," we conclude it abused its discretion. (See *Haraguchi, supra*, 43 Cal.4th at p. 711; *People v. Cluff, supra,* 87 Cal.App.4th at p. 998.)

In addition, there were instances in the court's decision in which it referred to some of the shortcomings of counsel in this case, but excused those shortcomings based on arbitrary factors. (*Haraguchi, supra*, 43 Cal.4th at p. 712; *In re White, supra*, 9 Cal.5th at p. 470; *People v. Giminez, supra,* 14 Cal.3d at p. 72.)

For example, we noted above that attorney Quinn testified that the failure to enter an NGI plea was "entirely an oversight." Nonetheless, the court stated it did not "fault [him] for that." It explained: "He has not been

the exercise of their legal rights, and it creates a backlog of cases for the courts, the prosecution, and the subcontractor attorneys." (*Ibid.*)

22

involved in this case for more than two years. I do believe Mr. Quinn intended on raising that issue with the defendant again had he stayed in the case, but he was relieved." However, Quinn was relieved as counsel on November 13, 2019, over 14 months after the August 28, 2018 arraignment. This means Quinn had over 14 months to "rais[e] that issue with the defendant" or the court before another attorney took his place. Logically, we fail to see how Quinn's departure from the case prevented him from ensuring that an NGI plea had been entered within a reasonable time after the arraignment. As such, the court's decision to excuse Quinn's admitted "oversight" based on him being relieved as counsel was arbitrary.

As another example, in discussing defense counsel's failures to discuss the NGI defense with defendant and to take any actions at all to prepare for the sanity phase of trial, the court stated: "the evidence . . . shows that counsel for the defendant, former and current, secretly harbored a belief that an NGI plea had been entered," which counsel explained was the reason they did not seek the entry of that plea after the arraignment. However, in the following paragraph, the court refused to accept that counsel could have held such a belief. It questioned why, "if any attorney [of defendant's]. . . believed an NGI was entered," . . . would none of them take some sort of action" to follow up on "the missing section 1026 evaluations" or "to prepare for a sanity trial." In the next paragraph, the court then stated, "If I were to find any of defendant's attorneys were so incompetent that they believed . . . there was going to be a sanity trial without having to [listing various tasks related to preparing for a sanity trial], such a finding would be based on speculation. There's certainly no evidence of any of that happening. If that did in fact happen . . . any of the attorneys involved . . . would have submitted a declaration or offered testimony admitting to his or her incompetence in that

23

regard as they are duty bound to do so."

The court's reasoning is hard to follow. First, the court's comments appear to be internally inconsistent. In one paragraph it acknowledged the evidence showed that defense counsel "harbored a belief that an NGI plea had been entered." But in the following paragraphs, the court took a seemingly inconsistent view. It suggested that counsel could not have held such a belief, because if they did hold such a belief, then that would mean they were incompetent for doing nothing to prepare for the sanity phase of trial. In addition, when the court stated there was no evidence that counsel were "so incompetent" in that regard because none of them affirmatively admitted to his or her incompetence in a declaration or testimony, it imposed an evidentiary rule that is not based on any law as far as we know. We are not aware of any law that precludes a finding of attorney incompetence merely because the attorney did not expressly admit to his or her incompetence in a declaration or in testimony. To the contrary, we can conceive of cases in which incompetence may be established by other forms of evidence and by less explicit means. As such, we believe the court set up an arbitrary rule, which it then relied upon to avoid having to scrutinize the inactions of defendant's attorneys with respect to the NGI defense.

For all of the above reasons, we conclude the court abused its discretion in denying defendant's request to enter an NGI plea to the superseding indictment.

In so concluding, we note defendant's comment that "[i]t is understandable that the trial court was frustrated with the age of this case before it went to trial. . . ." We are also mindful of the challenges facing overworked attorneys of indigent defendants, particularly in the wake of the pandemic. At the same time, however, in our view it was unfair for the court

24

to impute the delay in tendering an NGI plea to the charges entirely on defendant, and then use that as a basis to deny his request to enter such a plea, for the reasons stated above. Moreover, this is not a case involving a defendant seeking to enter an NGI plea as part of a calculated scheme of delay. To the contrary, defendant here made known to everyone his intent to enter a plea of NGI to the superseding indictment at the outset, but, because the issue "got kind of lost [in the] shuffle[ ]," he was unable to formally enter the plea.

## DISPOSITION

The judgment is affirmed insofar as it adjudicates defendant's guilt. The order denying defendant's request to enter a plea of not guilty by reason of insanity to the charges in the superseding indictment filed on July 26, 2018 is reversed. The matter is remanded to the trial court with directions to allow defendant to enter his plea of not guilty by reason of insanity to the charges in the superseding indictment.

25

_____
Richman, J.

We concur:


_____
Stewart, P.J.


_____
Markman, J. *


*People v. Timmons* (A165343)

*Superior Court of Alameda County, Judge Michael Markman, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

26